AL/MTK
F. #2017R00319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALBERT VELIU,
        also known as "Benny Veliu,"
CHRISTOPHER CURANOVIC,
XHEVAT GOCAJ,
DILBER KUKIC,
TRISH LUM,
ANTHONY NOTERILE,
AGIM RUGOVA,
EKRAM SEJDIJA,
MARTIN SHKRELI and
ALBAN VELIU,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**17M 585**

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(18 U.S.C. §§ 371, 922(a)(4), 894(a)(1),
1956(h); 21 U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

        GARY M. BAILEY, being duly sworn, deposes and says that he is a Special

Agent with the Internal Revenue Service ("IRS"), duly appointed according to law and acting

as such.

        In or about and between April 2017 and June 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant ALBERT VELIU, also known as "Benny Veliu," together with others, did

knowingly and willfully conspire to transport in interstate or foreign commerce a

destructive device or machinegun, contrary to Title 18, United States Code, Section 922(a)(4).

(Title 18, United States Code, Sections 371, 922(a)(4) and 3551 et seq.)

In or about and between  October 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALBERT VELIU, also known as "Benny Veliu," CHRISTOPHER CURANOVIC and ANTHONY NOTERILE, together with others, did knowingly and willfully conspire to conduct one or more financial transactions in and affecting interstate commerce to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

In or about and between  October 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants XHEVAT GOCAJ, DILBER KUKIC, AGIM RUGOVA, EKRAM SEJDIJA, MARTIN SHKRELI and ALBAN VELIU, together with others, did knowingly and willfully conspire to conduct one or more financial transactions in and affecting interstate commerce to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

In or about and between October 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ALBERT VELIU, also known as "Benny Veliu," CHRISTOPHER

CURANOVIC and ANTHONY NOTERILE, together with others, did knowingly and

intentionally conspire to participate in the use of extortionate means to collect and attempt to

collect an extension of credit from one or more persons, including but not limited to CS-1.

(Title 18, United States Code, Sections 894(a)(1) and 3551 et seq.)

In or about and between March 2017 and June 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ALBERT VELIU, also known as "Benny Veliu," CHRISTOPHER

CURANOVIC and TRISH LUM, together with others, did knowingly and intentionally

conspire to distribute and possess with intent to distribute a controlled substance, which

offense involved a substance containing marijuana, a Schedule I controlled substance, in

violation of Title 21, United States Code, Section 841.

(Title 21, United States Code, Section 846)

## **INTRODUCTION**

The source of your deponent's information and the grounds for his belief are

as follows:

1.       I have been a Special Agent with the IRS for approximately seven

years. I am currently assigned to the DEA New York OCDE Strike Force, which

investigates individuals and organizations engaged in organized crime, to include narcotics

trafficking, money laundering and extortion.

2.       I have personally participated in the investigation of the defendants as

discussed below. I am familiar with the facts and circumstances of this investigation from,

3

among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, (c) my review of consensual recordings and videos, (d) discussions with confidential sources, (e) my review of judicially-authorized wiretaps, and (f) bank records and public records, among other sources of evidence.

       3.     Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth each and every fact learned during the course of this investigation.  Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants sought herein.  In addition, where the contents of documents, or the actions, statements and conversations of others, are reported herein, they are reported in substance and in part, except where otherwise indicated.  Summaries of recorded conversations are based upon draft transcripts of these conversations, which are subject to revision.

## PROBABLE CAUSE

I.    Background of the Investigation

       2.     Since approximately October 2016, DEA and IRS agents have been investigating suspected narcotics trafficking, money laundering and extortion conspiracy occurring in New York City, among other locations.

       3.     In October 2016, DEA agents learned information through a confidential source ("CS-1"), whose information has been proven to be reliable in the past.

CS-1's information has been corroborated by independent evidence, such as surveillance and recordings of meetings with targets and other witnesses.[1]  Specifically, agents learned from CS-1 that CHRISTOPHER CURANOVIC was previously involved in the sale and distribution of large quantities of cocaine and marijuana as well as the collection of extortionate debt in the New York metropolitan area.

4.     In 2008, CURANOVIC was arrested along with members and associates of the Colombo crime family in connection with a racketeering conspiracy.  He was convicted in 2010 and sentenced to ten years' incarceration.  See 08 Cr. 240 (BMC). CURANOVIC is currently incarcerated at FCI Fort Dix, with an anticipated release date of 2019.

A.     The Money Laundering and Extortionate Debt Collection Scheme

5.     CS-1 informed agents that he owed a $40,000.00 extortionate debt to CURANOVIC.  In 2007, CS-1 owned and operated an auto mechanic garage in Brooklyn, New York.  In 2007, he was approached by associates of the Genovese organized crime family of La Cosa Nostra (the "Genovese family") for payment of so-called protection money.  CS-1 began making payments to these individuals, but was soon unable to continue the payments.  CURANOVIC approached CS-1 and offered to make a lump sum payment of $40,000.00 on behalf of CS-1 in exchange for the cessation of the protection money.  The Genovese family associates agreed to this arrangement and the payment was made.

---

[1]     CS-1 has previously been convicted of criminal possession of stolen property, possession of a forged instrument, insurance fraud, assault with the intent to cause serious injury, and possession of stolen mail.  CS-1 is working with the DEA in an effort to receive a reduced sentence in an open criminal case.  Since 2005, CS-1 has provided reliable information to the DEA that has resulted in multiple arrests.

6.    On or about October 15, 2016, CURANOVIC, from prison, sent threatening text messages to CS-1 regarding the payment of the $40,000.00 debt. CS-1 sent screen shots of the text messages to DEA agents. For example, CURANOVIC stated "I saved u from that other guy. And im getting it from u" and "u gonna be a man and take care of it."

7.    On or about October 16, 2016, at the direction of DEA agents, CS-1 called CURANOVIC to discuss payment of the $40,000.00 debt. CS-1 conducted a three-way call with CURANOVIC with a DEA agent on the other line. The phone call was recorded by the DEA. CURANOVIC stated, in sum and substance, that he was willing to go back to prison in order to get his money from CS-1. CS-1 understood this statement to mean that CURANOVIC was willing to use violence against CS-1 to collect his debt. CURANOVIC also stated, "If in two weeks you don't have what you are supposed to have, okay, then I'm going to take that as you saying 'fuck you' to me."

8.    On or about October 23, 2016, at the direction of DEA agents, CS-1 called CURANOVIC. The phone call was recorded. CS-1 stated, in sum and substance, that he wanted to begin to make payments on his debt to CURANOVIC. CURANOVIC agreed to accept $2,000.00 from CS-1 every two weeks until the debt was paid off.

9.    In the same conversation, CS-1 informed CURANOVIC that an associate of CS-1 would provide the money to CURANOVIC every two weeks. In reality, this associate was another DEA confidential source (hereinafter "CS-2").[2] CURANOVIC

---

[2]    CS-2 has prior misdemeanor convictions for petty larceny, disorderly conduct, menacing and assault in the third degree. CS-2 has no pending criminal charges and is not on parole. CS-2 has been working with the DEA since approximately 2015. CS-2 has received

6

stated, in sum and substance, that the bi-weekly payments should be provided to

CURANOVIC's associate ANTHONY NOTERILE.

10. On or about October 27, 2016, at the direction of DEA agents, CS-2

met NOTERILE and provided him with $2,000.00 on behalf of CS-1. The exchange took

place in NOTERILE's vehicle in Queens, New York, during which time NOTERILE spoke

with CURANOVIC over the vehicle's Bluetooth speaker system. NOTERILE stated to

CURANOVIC, in sum and substance, that CS-2 had provided the money to him.

CURANOVIC stated, in sum and substance, that NOTERILE should give the money to

another associate, later identified as ALBERT VELIU, also known as "Benny Veliu."

[QUEENS]

11. On or about January 18, 2017, CURANOVIC sent threatening text

messages to CS-1 informing CS-1, in sum and substance, that the debt needed to be paid

immediately. For example, CURANOVIC texted CS-1, "WHAT R U GOING TO HAVE

FOR ME" and "I'm not going thru this shit not more."

12. On or about January 19, 2017, at the direction of DEA agents, CS-1

and CS-2 attended a meeting with NOTERILE to discuss the payment of CS-1's debt

through a money-laundering arrangement. The meeting was recorded. At this meeting, CS-1

stated that he did not have the money to continue paying CURANOVIC, but that CS-2 would

be able to provide CURANOVIC with the proceeds of drug trafficking that required

laundering. CS-2 informed NOTERILE that CURANOVIC would receive a six percent

payment for the information and services he has provided to the DEA. His information has
proven to be reliable in this investigation and his previous cooperation has resulted in numerous
arrests.

commission for the laundering services. In addition, four percent of the funds would go to repay CS-1's debt to CURANOVIC. CS-2 informed NOTERILE that he would contact him at a future date to discuss the money laundering.

13. On or about January 26, 2017, at the direction of DEA agents, CS-2 met with NOTERILE in Queens, New York. This meeting was recorded. At the meeting, CS-2 provided NOTERILE with $20,000.00 in funds as part of the arrangement discussed at the January 19, 2017 meeting. NOTERILE accepted the money and agreed to provide the money to an associate of CURANOIVC, later identified as ALBERT VELIU.

14. On or about January 31, 2017, at the direction of DEA agents, CS-2 met with NOTERILE and VELIU. The meeting was recorded. At this meeting, the terms of the extortionate collection and money laundering arrangement were once again discussed between the parties. The parties discussed the use of fraudulent invoices to make it appear that a "clean" check was the result of a legitimate business transaction.

15. The parties also agreed that CURANOVIC, NOTERILE and VELIU would collect the money from CS-2. The parties also agreed that four percent of the laundered funds would constitute payment towards CS-1's debt. CURANOVIC, NOTERILE and VELIU would also receive six percent of the funds as payment for laundering the money. The parties acknowledged that money that CS-2 provided was the proceeds of narcotics sales.

16. Later that day, CS-2 informed NOTERILE that the laundered check should be made out "LMC Trading."

17.     On or about February 3, 2017, VELIU and CS-2 met for dinner at a Manhattan steak house to discuss future criminal activity.  The dinner meeting was recorded. VELIU and CS-2 discussed future money laundering activities and narcotics trafficking.

18.     VELIU also informed CS-2 that his cousin is ALEX RUDAJ.  RUDAJ is widely recognized as the leader of Albanian organized crime in New York.  In 2006, RUDAJ was convicted in the Southern District of New York of, among other things, racketeering, and sentenced to 27 years in prison.  Additionally, VELIU has informed CS-2 that his father-in-law is the leader of an Albanian organized crime faction in the Czech Republic.

19.     VELIU informed CS-2 that he was interested in transporting large amounts of cash to the Czech Republic and other Eastern European countries to be laundered back into the United States.  VELIU informed CS-2 that his father-in-law could facilitate such a transaction.  VELIU also informed CS-2 that he could provide CS-2 with a source of supply for marijuana.

20.     On or about February 6, 7 and 10, 2017, CS-2 spoke to VELIU and inquired about the status of his $20,000.00 that he previously provided to NOTERILE and VELIU to be laundered.  These calls were recorded.  VELIU stated, in sum and substance, that he was waiting for replacement checks from his bank.  Once VELIU received the checks, he would provide CS-2 with a "clean" check.

21.     On or about February 11, 2017, CS-2 met with VELIU near a Target store in the Bronx, New York.  The meeting was recorded.  At this meeting, VELIU provided CS-2 with a check for $7,200.00.  The check purported to be a personal check from "Albert

9

Veliu" made out to "LMC Trading," and was signed by VELIU. The reference line stated that it was for "services rendered."

22.     At this meeting, VELIU and CS-2 also discussed the potential laundering of $100,000.00. VELIU informed CS-2 that he could launder $100,000.00 within approximately one month. VELIU also requested that CS-2 provide him with a money counter. A money counter is an electronic device that rapidly counts currency. CS-2 agreed to provide a money counter at the next meeting.

23.     On or about February 15, 2017, CS-2 met with VELIU in the vicinity of Arthur Avenue in the Bronx, New York. CS-2 recorded this meeting. At this meeting the two discussed, among other things, the remaining funds to be paid to CS-2. VELIU also stated, in sum and substance, that NOTERILE had informed him that CS-2 was involved in narcotics trafficking.

24.     On or about February 23, 2017, CS-2 and VELIU met on the Upper West Side of Manhattan. This meeting was recorded. At this meeting, VELIU provided a check for $6,900.00 to CS-2, which amount represented additional laundered funds owed to CS-2 pursuant to the January 26, 2017 transaction and the parties' January 31, 2017 agreement, i.e., that four percent of the funds would go to repay CS-1's debt to CURANOVIC and six percent of the funds would be the commission for the laundering of the money. The parties agreed that the remaining funds owed to CS-2 would be recouped in future money-laundering transactions.

25.     On or about March 1, 2017, CS-2 met with VELIU and provided $20,000.00 in funds to be laundered.

26.     On or about March 9, 2017, VELIU provided CS-2 with two $9,000.00 checks. The checks, dated February 10, 2017 and March 6, 2017, were written out to "LMC Trading." The checks were written on the account of "J.R. Interior Designs Inc." The checks were signed by "Rugova." Through bank records, the investigation has revealed that AGIM RUGOVA is the principal of J.R. Interior Designs Inc.

27.     One of the checks provided by RUGOVA bounced. VELIU subsequently provided CS-2 with an additional check for $9,000.00 to "LMC Holding." The check was once again drawn on the account of "J.R. Interior Designs Inc" and signed by "Rugova."

28.     On or about April 8, 2017, AGIM RUGOVA called VELIU to discuss borrowing $500,000.00 from CS-2 to pay off a debt.[3] RUGOVA stated that he would pay back the $500,000.00 with interest. He also stated to VELIU that "you gotta weigh it out [U/I], with interest and to give him back those checks." Based on my training and experience, I believe that RUGOVA was proposing to provide CS-2 with "clean checks" over the course of a specified time in exchange for the $500,000.00 in cash. These checks would also contain interest payments on the $500,000.00.

---

[3] On March 13, 2017, the Honorable Jack B. Weinstein authorized the interception of wire and electronic communications occurring to and from the cellular telephone number 347-679-5064, with IMSI Number 310260514477030, which is a telephone subscribed to by Raba Veliu and used by ALBERT VELIU, also known as "Benny Veliu." This application was reauthorized on April 13, 2017 and May 16, 2017 (17 Misc. 716 (JBW)). Conversations quoted herein are in draft format and are subject to revision. Additionally, certain conversations quoted herein are translations and are also subject to revision.

29. On or about May 3, 2017, VELIU called AGIM RUGOVA. Agents identified RUGOVA through subscriber information. VELIU also referred to this individual as "Agim" in subsequent calls. During the conversation, the following exchange occurred:

RUGOVA: Do you recall a check that was returned?

VELIU: Yes.

RUGOVA: Uh . . . the bank is telling me that, to give it to them, because they charged me thirty dollars.

VELIU: Yes.

RUGOVA: Uh . . . stop payment.

VELIU: Yes.

RUGOVA: But, I was told that if you present the check, then we will remove it from there.

VELIU: Okay well, because I don't know.

RUGOVA: [U/I].

ALBERT: I'll give you, a hundred dollars.

30. Based on my training and experience, I believe that RUGOVA was asking VELIU to get the bounced check back from CS-2 so that he would not be forced to pay the $30.00 bank fee. VELIU stated that he would just pay RUGOVA $100.00 instead of retrieving the check from CS-2.

31. On or about March 14, 2017, CS-2 met with VELIU and provided $50,000.00 in DEA funds for VELIU to launder.

32.     On or about March 15, 2017, VELIU texted CURANOVIC and stated, in sum and substance, that he had received $49,000.00 from CS-1 to launder. VELIU also texted that he expected to receive an additional $50,000.00 later in the day.

33.     On or about March 16, 2017, CS-2 met with VELIU in Manhattan and provided him with an additional $50,000.00 to launder. VELIU later texted CURANOVIC, in sum and substance, that he had received a total of $99,000.00 from CS-2 to launder.

34.     On or about March 20, 2017, VELIU called DILBER KUKIC[4] and discussed providing "clean" checks for the $100,000.00 in dirty funds that he received from CS-2. Agents identified KUKIC through subscriber information. KUKIC subsequently agreed to provide two "clean" checks for VELIU. During that call, the following exchange occurred:

| VELIU: | So, when are we going to get together? |
|---|---|
| KUKIC: | Uh, should we leave it for Thursday? Send me the    thing, text. |
| VELIU: | Yes. |
| KUKIC: | Do you have a pencil? I'm going to send you a number and you send me a text. How do you want me to do it, by 40s or 2 at 50 each? |
| VELIU: | Uh . . . one 5, one 4. |
| KUKIC: | One 5, one 4, okay. |
| VELIU: | Yes, okay. |
| KUKIC: | One 5, one 4. |

_____

[4] DILBER KUKIC is currently charged with involuntary manslaughter in New York County. These charges relate to the March 2015 gas explosion in the East Village that killed two people and destroyed three buildings. He is scheduled to go to trial in July 2017.

VELIU:      Yes.

KUKIC:      No problem.

VELIU:      Or see if you can find [U/I].

KUKIC:      I will send you a number.  I will send you a phone number.

VELIU:      Yes.

KUKIC:      And you can text me to that number.

VELIU:      Consider it done.

KUKIC:      Or just wait a minute for me, don't hang up.

VELIU:      Go.

KUKIC:      Write it down.

VELIU:      Go.

KUKIC:      Just to show in whose name to do it in, you know?

VELIU:      Wait, just a few.

KUKIC:      [U/I]

VELIU:      What is it?

*********

KUKIC:      Okay, write this . . .

VELIU:      Okay.

KUKIC:      516

VELIU:      516

KUKIC:      943

VELIU:      943

KUKIC:      44 . . . 4244, 42

VELIU:      Okay. Ka, ka . . . three fours and a two.

KUKIC:      Yes and don't give anyone this number.

VELIU:      No, no, it's done, it's done, its done.

KUKIC:      Yes, just don't [Audio fades] not joking.

VELIU:      All right, so I will send you a message.

KUKIC:      Thursday.  [U/I] Thursday we will probably see each other.

VELIU:      [Audio fades] Consider it done.  All right then.

KUKIC:      All right.  Okay.

VELIU:      Bye.

KUKIC:      Bye, bye-bye.

35.     Based on my training and experience, I believe that in this conversation
DILBER KUKIC was discussing providing "clean" checks to VELIU in exchange for the
$100,000.00 provided by CS-2.  When KUKIC asked, "How do you want me to do it, by 40s
or 2 at 50 each?" I believe he was referring to the denominations the "clean" checks should
be written for.  I also believe that KUKIC provided VELIU with an alternate phone number
(516-943-4442) to use for conversations that deal with their money laundering activities.

36.     Later that day, VELIU texted KUKIC and informed him, in sum and
substance, that the checks should be made out to "LMC trading."

37.     On or about March 27, 2017, VELIU provided CS-2 with two "clean"
checks written out to "LMC Trading" in the amount of $50,000.00 and $40,000.00.  The

15

checks were written on the account of Omer Kukic. A records check reveals that Omer Kukic is the father of DILBER KUKIC.

38.     On or about April 8, 2017, CS-2 met with VELIU and provided an additional $150,000.00 in funds to be laundered.

39.     On or about April 10, 2017, CS-2 introduced VELIU to an additional confidential source ("CS-3")[5] for the purposes of discussing future criminal activities. CS-2 informed VELIU that CS-3 was CS-2's boss in the same street gang. This meeting took place in a hotel room in Manhattan and was both audio and visually recorded. At this meeting, CS-3 and VELIU discussed future money laundering activities and, as discussed more fully below, the possible purchase of firearms in Eastern Europe.

40.     On or about April 17, 2017, VELIU called MARTIN SHKRELI[6] and discussed providing "clean" checks for the $150,000.00 in dirty funds that he received from CS-2. Agents identified SHKRELI through subscriber information. During this conversation, the following exchanged occurred:

> SHKRELI:     Alright listen, I got, I had that check ready for them but then,. Send Alex an email to send you sample of an insurance certificate . They gotta do insurance, insurance certificate but they're charging like fuckin crazy amount of insurance on that shit man.

---

[5] CS-3 has prior misdemeanor convictions for attempted assault and trespassing, and felony convictions for robbery, forgery, false statement in connection with the purchase of a firearm by a convicted felon, bank fraud, criminal possession of a controlled substance and a loaded firearm. CS-3 has no pending criminal charges and is not on parole. CS-3 has been working with the DEA since approximately 2014 after having been arrested in connection with drug charges. CS-3's information has proven to be reliable in this investigation and his previous cooperation has resulted in numerous arrests.

[6] This is not the same Martin Shkreli who is currently on trial in the Eastern District of New York. See United States v. Martin Shkreli, 15-CR-637 (KAM).

| VELIU: | Oh yeah? |
|---|---|
| SHKRELI: | Yeah I gotta have the fuckin certificate otherwise. |
| VELIU: | I know, I know alright so what, what, what do you need?  Just the certificate? |
| SHKRELI: | Yeah, Alex will send a sample of what he needs. |
| VELIU: | Alright no problem.  Let me call, let me call that guy and see. |
| SHKRELI: | Yeah call the guy and call, call and straighten it out. |
| VELIU: | You got it brother. |

41.     Based on my training and experience, I believe that SHKRELI was asking VELIU to provide a fraudulent certificate of insurance.

42.     That same day, SHKRELI called VELIU and asked, in sum and substance, the name of the company that the checks should be made out to.

43.     On or about April 18, 2017, VELIU called CS-2 and asked him to provide fraudulent paperwork for the funds to be laundered.  That same day, CS-2 provided VELIU with paperwork for a company named "Temaco Electronics Corporation."

44.     On or about April 21, 2017, VELIU provided CS-2 with a check for $135,000.00.  The check was made out to "Tumasco Electronics" from the account of "Alba Group Inc."  Through bank records and public records, the investigation has revealed that the principal of "Alba Group Inc" is MARTIN SHKRELI.

17

45.     On or about May 3, 2017, CS-3 met with VELIU at a hotel room in Brooklyn and discussed future criminal activity and provided VELIU with $270,000.00 in funds to be laundered.  This meeting was both audio and visually recorded.

46.     At this meeting, VELIU accepted the funds and stated, in sum and substance, that if CS-3 could provide larger sums of money, VELIU would be able to launder the funds in Eastern Europe.  CS-3 stated, in sum and substance, that the money being laundered by VELIU was the proceeds of narcotics provided by Mexican cartels.  CS-3 also stated he had access to significant funds that would need to be laundered in the future.  As detailed below in paragraph 69, at this meeting VELIU and CS-3 also discussed the purchase of AK-47s from Eastern Europe, specifically, Kosovo and Albania.

47.     On or about May 8, 2017, VELIU texted CURANOVIC and asked for assistance in the collection of another extortionate debt.  VELIU stated, in sum and substance, that the debtor owed his cousin, later identified as EKRAM SEJDIJA, $38,000.00.  CURANOVIC informed VELIU that "If I get these fukn italians involved they gonna want smth."  Based on my training and experience, I believe that when CURANOVIC says "these fukn Italians," he was probably referring to members of La Cosa Nostra.  When CURANOVIC stated "they gonna want smth," he was using an abbreviation for "something" and referring to the portion of the outstanding debt that the "italians" would take as payment for collection.

48.     On or about May 17, 2017, VELIU and DILBER KUKIC spoke on the telephone and discussed the laundering of the $270,000.00 provided by CS-3.  KUKIC

stated, in sum and substance, that he could provide the funds in multiple checks, "but it will add up to the amount needed."

49.     On or about May 18, 2017, VELIU provided CS-2 and CS-3 with four checks totaling $243,000.00. The checks were written to "Temaco Electronics Corp." and were drawn on the accounts of "Allstate Home Improvement Corp." and "Neighborhood Contracting Corp." Through bank records and public records, the investigation has revealed that both of these entities are associated with DILBER KUKIC.

50.     On or about May 26, 2017, CS-2 provided VELIU with $50,000.00 in funds to launder.

51.     On or about May 30, 2017, VELIU called CS-2 and discussed the laundering of the $50,000.00. The following exchange occurred:

| | |
|---|---|
| VELIU: | It's on two, it's on two . . . twenty-five. But listen, what I need from you, I need two receipts. |
| CS-2: | Okay. |
| VELIU: | I need two receipts, let's say one that they did a job for, uh, let's say, twenty-three something, plus the tax equal to twenty-five. You get what I'm saying? |
| CS-2: | Alright so, on both you need receipts. You need two receipts for twenty-three and the taxes come up to twenty-five? |
| VELIU: | Yeah! Well tell the guy to do the math there. |
| CS-2: | All right, bet. Aight. I gotcha. |
| VELIU: | And, and, I need them on two different addresses cause I got from two, there's from, it's from one guy but its two. One is in a restaurant and one is |